# 𝔘nited 𝔖tates 𝔠ourt of 𝔉ederal 𝔠laims

No. 09-509 C
September 8, 2011

---

**Insurance Company of the West,**

       *Plaintiff,*

**v.**

**United States of America,**

       *Defendant.*

Surety; Contract Disputes
Act; Anti-Assignment Acts;
Equitable Subrogation;
Waiver; Silence as Assent

---

    *Christopher M. Bunge*, Watt, Tieder, Hoffar & Fitzgerald, L.L.P., Irvine, CA, for plaintiff.

    *James W. Poirier*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant.

## OPINION *and* ORDER

**Block,** *Judge.*

    On August 4, 2009, plaintiff, Insurance Company of the West ("ICW") filed this action, pursuant to the Contract Disputes Act ("CDA"),[1] in which it seeks to appeal, as equitable subrogee and assignee of the W.R. Chavez Construction Company, Inc. ("Chavez"), a contracting officer's final decision denying additional compensation to Chavez on its claims for delayed project completion and additional work. On December 3, 2009, defendant filed a motion to dismiss for lack of jurisdiction, pursuant to Rule of the Court of Federal Claims ("RCFC") 12(b)(1). *See* Def.'s Mot. to Dismiss at 1. Therein, defendant argues that plaintiff cannot maintain an action under the CDA because plaintiff is not the contractor, *id.* at 4, has not identified any assignment from the contractor, Chavez, to plaintiff that is effective against the

---

[1] As this court explained in *Redland Co., Inc. v. United States*, the enactment of Public Law No. 111-350 reorganized Title 41 of the United States Code and in particular the CDA. *See* 97 Fed. Cl. 736, 740 n.1 (2011); Pub. L. No. 111-350, 124 Stat. 3677 (2011). The provisions of the Contract Disputes Act of 1978, originally located at 41 U.S.C. §§ 601–13, are now found at 41 U.S.C. §§ 7101–09. *See* Pub. L. No. 111-350 § 7, 124 Stat. at 3860; *Envtl. Safety Consultants, Inc. v. United States*, 97 Fed. Cl. 190, 195 (2011) (recognizing the change in statutory provisions). The new codification removes nearly all references to the "Contract Disputes Act." *See* Pub. L. No. 111-350 § 5, 124 Stat. at 3841–50. However, for the sake of familiarity the court will continue to refer to the new codification as the Contract Disputes Act or CDA.

government, *id.* at 6, and has not alleged facts sufficient to show it is an equitable subrogee, *id.* at 7.  Because plaintiff was not the contractor and has not demonstrated that the government has waived the protections of the Assignment of Claims Act, 31 U.S.C. § 3727, to allow plaintiff to assert the contractor's claims, it cannot maintain this action.  Accordingly, defendant's motion to dismiss is GRANTED.

## I. BACKGROUND

In September 1999, Chavez entered into Contract Number N68711-99-D-6203 with the U.S. Department of the Navy ("the Navy") to design and construct the "Live Fire Survivability Test & Evaluation Complex," ("the project") located at Naval Air Weapons Station China Lake in California.  Am. Compl. ¶ 5.  Pursuant to the Miller Act, Chavez was required to obtain payment and performance bonds.  *See* 40 U.S.C. § 3131 (requiring a prospective contractor to furnish performance and payment bonds before the federal government awards a construction contract in excess of $100,000).  In the event that a contractor defaults on a contract, a performance bond guarantees that a construction project will be completed, while a payment bond guarantees that subcontractors and suppliers will be paid for their contributions to a project.  *See United Pacific Ins. Co. v. United States*, 464 F.3d 1325, 1326 n.2 (Fed. Cir. 2006).  Plaintiff issued both of these bonds to Chavez, thereby becoming Chavez's surety.  Am. Compl. ¶ 5.  Chavez then entered into the contract with the Navy and began work on the project in September 1999.  Am. Compl. ¶ 10.

On March 26, 2001, Chavez executed a General Indemnity Agreement for the benefit of plaintiff.  *See* Ulibarri Decl. Ex. A at 1 [hereinafter "GIA"].  In the General Indemnity Agreement, Chavez assigned to plaintiff "all monies due or to become due to [Chavez] as a result of the contract covered by [the] Bonds, including . . . proceeds of any delay or other damage claims" and "all other rights of [Chavez] in or growing out of the contract covered by [the] Bonds."  GIA ¶ 5.  The General Indemnity Agreement provided that "[t]his assignment shall be effective as of the date of [the] Bonds, but only in the event of a Default of this Agreement."  *Id.*  The General Indemnity Agreement also defined default to include failure to perform any contract covered by the bonds, failure to pay bills incurred in connection with any contract covered by the bonds, and failure to comply with the terms of the General Indemnity Agreement.  *Id.* ¶ 4.

In August 2002, Chavez and plaintiff jointly notified the Navy that Chavez would not be able to meet its obligations under the bonds issued by plaintiff.  Am. Compl. ¶ 6.  At that time, Chavez and plaintiff also requested that the Navy direct to plaintiff all future payments that would otherwise be owed to Chavez, including payments for the settlement of any claims Chavez had against the Navy.  *Id.*; Ulibarri Decl. ¶ 10.

Following this request, Chavez continued working on the project with the assistance of plaintiff.  Am. Compl. ¶ 7.  In particular, plaintiff provided financing to Chavez and also paid Roel Construction Company ("Roel") to assist Chavez in completing the project.  Ulibarri Decl. ¶ 5.  The Navy was aware that Roel was assisting Chavez.  Montgomery Decl. ¶¶ 4–5.  Roel assigned a project superintendent who did daily work on the project and a project manager who attended weekly meetings with the Navy.  *Id.*  While plaintiff and Roel were assisting Chavez,

the Navy met with Chavez, Roel, and plaintiff to discuss settlement of certain claims that Chavez had asserted against the Navy for project delays and for additional work required by the Navy. Ulibarri Decl. ¶ 9.  An employee from the Navy advised plaintiff and Roel to submit a formal request for equitable adjustment in order to seek additional compensation on Chavez's claims. Ulibarri Decl. ¶ 8.

In late January 2004, Chavez's principals, Wilfred and Deborah Chavez, each executed a "Compromise Settlement and Mutual Release Agreement" ("Compromise Settlement") with plaintiff.  *See* Am. Compl. Ex. B.  Each Compromise Settlement established the rights of the respective parties in light of the fact that Chavez was unable to perform its construction contracts and had defaulted on the bonds issued by plaintiff.  *See id.*

Despite plaintiff and Roel's assistance, Chavez was unable to complete the project, and plaintiff, as the issuer of the performance bond, became responsible for its completion.  *Id.* ¶ 7. Plaintiff, Chavez, Roel, and the Navy entered into a four-party agreement on May 26, 2004 (the "Four-Party Agreement") under which Roel would complete all remaining work on the project. *Id.* Ex. A ¶ 1.  The parties agreed that Roel would find its own surety to furnish payment and performance bonds for the project's completion.  *Id.* Ex. A ¶ 2.

On March 8, 2007, Chavez submitted a written claim to the Navy seeking $1,466,799.34 as compensation for alleged project delays and additional work.  *Id.* ¶ 17.  In its claim, Chavez noted that "[d]ue to [Chavez]'s inability to complete the project, ICW . . . assumed responsibility for completing the project.  [Chavez] thereafter assigned to ICW all rights to any claims against the [g]overnment."  Def.'s Reply App. at 5.  The contracting officer ("CO") for the Navy issued a written decision on November 2, 2008, granting Chavez additional compensation in the amount of $6,068 for delays resulting from base closures following the attacks on September 11, 2001, but otherwise denying Chavez's claim.  Am. Compl. ¶ 18.  However, the Navy also asserted its own claim against Chavez for $85,043.00 because the government allegedly changed the contract specifications in a way that reduced Chavez's cost of performance.  *Id.*; Def.'s Mot. to Dismiss App. at 35.

Plaintiff then filed this action seeking compensation under the CDA on the claims denied by the CO in his November 2, 2008, decision.  *See* Am. Compl. ¶¶ 18, 20.  In its complaint, plaintiff relies on its alleged status as Chavez's equitable subrogee and assignee as the basis for this action.  *See id.* ¶ 20.  Defendant thereafter filed a motion to dismiss for lack of subject-matter jurisdiction, arguing that the plaintiff is not a "contractor," which is a prerequisite to plaintiff's suit under the CDA.  Def.'s Mot. to Dismiss at 1.   Thus, defendant argues that equitable subrogation provides no basis for plaintiff's claims.  *Id.* at 7.  Furthermore, according to defendant, plaintiff has failed to show an assignment from Chavez to plaintiff that is effective against the government.  *Id.* at 1.  After the parties completed briefing, the court conducted a hearing on the motion to dismiss.  *See* Tr. at 1.

## II. JURISDICTION AND STANDARD OF REVIEW

### A. Jurisdiction and Procedure Under the CDA

It is historically true that the United States cannot be sued in law or equity without its consent. *See United States v. Mitchell*, 463 U.S. 206, 212 (1983); *Cardiosom, L.L.C. v. United States*, No. 2010-5109, 2011 WL 3835406, at \*2 (Fed. Cir. Aug. 31, 2011), *available at* http://law.justia.com/cases/federal/appellate-courts/cafc (recognizing sovereign immunity as part of American common law). Such waivers are strictly construed in favor of the sovereign. *Orff v. United States*, 545 U.S. 596, 601–02 (2005). It is for this reason that "[j]urisdiction over any suit against the [g]overnment requires a clear statement from the United States waiving sovereign immunity, together with a claim falling within the terms of the waiver." *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003) (citations omitted). Pertinent for the purposes of this court, "[t]he Tucker Act contains such a waiver, giving the Court of Federal Claims jurisdiction to award damages" for any claim founded upon any express or implied contract with the United States. *Id.*; *see* 28 U.S.C. § 1491(a)(1). Furthermore, the Tucker Act waives sovereign immunity for assignees of the claim, unless a statute bars such an assignment. *Ins. Co. of the W. v. United States*, 243 F.3d 1367, 1375 (Fed. Cir. 2001) ("We conclude that the Tucker Act must be read to waive sovereign immunity for assignees as well as those holding the original claim, except as barred by a statutory provision.").

To be sure, as long recognized by the Federal Circuit, examples of such statutory bars are the Assignment of Claims Act, 31 U.S.C. § 3727, and the Assignment of Contracts Act, 41 U.S.C. § 15 (collectively the "Anti-Assignment Acts" or the "Acts"). In essence, these Acts withdraw the Tucker Act's waiver of sovereign immunity. *See Ins. Co. of the W.*, 243 F.3d at 1375. So, as explained more fully below, the Anti-Assignment Acts render an assignment ineffective against the United States unless the assignment complies with the requirements contained in the Acts or the government waives the protection of the Acts. *See Delmarva Power & Light Co. v. United States*, 542 F.3d 889, 892–93 (Fed. Cir. 2008) (explaining the Anti-Assignment Acts and their requirements). Consequently, when either of the Anti-Assignment Acts renders an assignment ineffective against the United States, the waiver of sovereign immunity found in the Tucker Act is withdrawn. *See Ins. Co. of the W.*, 243 F.3d at 1375. And without that waiver of sovereign immunity, no jurisdiction would exist to adjudicate the claim. *See id.*; *White Mountain Apache Tribe*, 537 U.S. at 472.

Furthermore, to add some complexity to the sovereign immunity waiver analysis, the Tucker Act confers upon this court "jurisdiction to render judgment upon any claim by or against . . . a contractor arising under" the CDA. 28 U.S.C. § 1491(a)(2), *amended by* Pub. L. No. 111-350, § 5(g)(7), 124 Stat. at 3848. Logic dictates that any right to sue in this court based on the Tucker Act's CDA jurisdictional waiver is contingent on the terms and conditions contained in the CDA. *See Inter-Coastal Xpress, Inc. v. United States*, 296 F.3d 1357, 1365 (Fed. Cir. 2002); 28 U.S.C. § 1491(a). For instance, instead of being able to sue directly in this court for a claim against the federal government, a contractor must first follow the procedures established by the CDA. *See M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323, 1327–28 (Fed. Cir. 2010); Pub. L. No. 111-350, § 3, 124 Stat. at 3816–26 (codified at 41 U.S.C. §§ 7101–09). These procedures, for example, require a contractor to first submit a claim to the contracting

officer responsible for administering that contract.   41 U.S.C. § 7102(a)(1).   The contracting officer is then required to issue a written decision on the contractor's claim.   41 U.S.C. § 7103(d).   And if the contractor is dissatisfied with the contracting officer's decision, the contractor, then and only then, may seek review of that decision in the Court of Federal Claims within twelve months of the date that the contracting officer issues the decision.[2]   41 U.S.C. § 7104(b).

### B. Standard of Review for Motion To Dismiss Pursuant to Rule 12(b)(1)

It is black letter law that the plaintiff, as the party invoking federal jurisdiction, has the burden of establishing jurisdiction by a preponderance of the evidence if the facts are in dispute. *See Hertz Corp. v. Friend*, 130 S. Ct. 1181, 1194–95 (2010); *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).   Consequently, there exist two categories of jurisdictional challenges.   If the defendant seeks dismissal under Rule 12(b)(1) by arguing that plaintiff's allegations are insufficient to establish jurisdiction—a so-called "facial" challenge—then these allegations must be taken as true and construed in the light most favorable to the plaintiff. *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583 (Fed. Cir. 1993).

In contrast to the "facial" challenge is the "factual" challenge, whereby the defendant contests "the factual basis for the court's subject matter jurisdiction."   In such a case, "the allegations in the complaint are not controlling and only uncontroverted factual allegations are accepted as true for purposes of the motion."   *Id.* (citations omitted).   Disputed facts in the motion to dismiss are subject to fact-finding by the court, which "may weigh relevant evidence" to determine the factual basis for jurisdiction.   *Ferreiro v. United States*, 350 F.3d 1318, 1324 (Fed. Cir. 2003).

## III. DISCUSSION

### A. Plaintiff's Jurisdictional Arguments

The dual issue of jurisdiction in this case revolves around the status of plaintiff, that is, whether the court may entertain this action under the CDA when plaintiff litigates, not as a contractor,[3] but as an equitable subrogee or assignee of Chavez, the actual contractor.   Am. Compl. at 1.   Taking equitable subrogation first, plaintiff posits two bases for jurisdiction.   The first of these arguments (raised only in plaintiff's briefs) relies on the Tucker Act's grant of jurisdiction over "any express . . . contract with the United States."   28 U.S.C. § 1491(a)(1).   To be sure, the Federal Circuit has established that this Tucker Act jurisdictional grant does indeed allow a surety, after fulfilling its obligations under the bonds it issued, to become equitably subrogated to the rights of a defaulting contractor and to assert the contractor's right to the

---

[2] Instead of filing in the Court of Federal Claims, the contractor may elect to appeal the contracting officer's decision to the appropriate agency board of contract appeals within ninety days of the contracting officer's decision.   41 U.S.C. § 7104(a).

[3] *See* Tr. at 31:18–19, 52:6–8 (plaintiff's counsel acknowledging that Chavez, not ICW, is the contractor).

contract balance. *See, e.g.*, *Ins. Co. of the W. v. United States*, 243 F.3d 1367, 1375 (Fed. Cir. 2001) (holding that "a subrogee . . . may rely on the waiver of sovereign immunity in the Tucker Act and bring suit against the United States"); *Balboa Ins. Co. v. United States*, 775 F.2d 1158, 1161 (Fed. Cir. 1985).

But this argument dies an unnatural death because it was raised for the very first time in plaintiff's briefs. *See* Pl.'s Opp'n at 8. Plaintiff, in fact, admits that no equitable subrogation claim based on the Tucker Act can be found in the complaint. Tr. at 40:20–41:1.[4] The import of this is that the court cannot consider the Tucker Act equitable subrogation claim. *See Bissessur v. Ind. Univ. Bd. of Trs.*, 581 F.3d 599, 603 (7th Cir. 2009) (citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.")); *Lawmaster v. Ward*, 125 F.3d 1341, 1346 n.2 (10th Cir. 1997) (refusing to consider a claim not alleged in the plaintiff's complaint); *Charles v. Rice*, 28 F.3d 1312, 1319 (1st Cir. 1994) (same); *McGrath v. United States*, 85 Fed. Cl. 769, 772–73 (2009) (same). For a court to do so would work an injustice. Indeed, the purpose of notice pleading under the Federal Rules of Civil Procedure, and this court's rules (which are based on the federal rules), is to prevent unfairness by avoiding "litigation by ambush." *Res. Recycling Corp., Inc. v. United States*, 56 Fed. Cl. 612, 618 (2003) (quoting *Cubic Def. Sys. v. United States*, 45 Fed. Cl. 450, 466–68 (1999)).

This, however, does not end the matter of plaintiff proceeding as an equitable subrogee because still to be decided is whether an equitable subrogation claim *under the CDA* is jurisdictionally viable. *See* Am. Compl. ¶¶ 9, 20. It is not. Federal Circuit precedent, binding on this court, *see, e.g.*, *Principal Mut. Life Ins. Co. v. United States*, 50 F.3d 1021, 1025 (Fed. Cir. 1995) (citing *W. Seattle Gen. Hosp., Inc., v. United States*, 1 Cl. Ct. 745, 746 (1983)), does not recognize an equitable subrogee as being a "contractor" for purposes of the CDA. *See Fireman's Fund v. England*, 313 F.3d 1344, 1351 (Fed. Cir. 2002) ("Even if Fireman's Fund were equitably subrogated to any claim that [the contractor] may have had against the government, that did not make Fireman's Fund a party to the contract between [the contractor] and the United States for purposes of the [Contract] Disputes Act."); *accord Winter v. FloorPro, Inc.*, 570 F.3d 1367, 1371 (Fed. Cir. 2009); *United Pac. Ins. Co. v. United States*, 464 F.3d 1325,

---

[4]       THE COURT: Okay. So show me in the complaint where [the Tucker Act allegations are]. I'm having trouble figuring [it] out. It sure looks to me like it's an appeal under the [CDA] and that's what you're alleging here.
      [PLAINTIFF'S COUNSEL]: It is, Your Honor. That's exactly what it is. Maybe inartfully pled, but in the alternative, there is a Tucker Act cause of action that ICW can pursue. It was briefed in my—
      THE COURT: No, no, no, no, no. I just want to know where in the amended complaint there [are] Tucker Act allegations.

\* \* \*

      THE COURT: [I]t sure looks like solely a [CDA] case.
      [PLAINTIFF'S COUNSEL]: I would agree, Your Honor. I would agree. I mean, perhaps like I said inartfully pled, but for the purposes of today [the hearing on the motion to dismiss] I would agree it's a CDA Claim . . . .
Tr. at 39:7-40:25.

1327 (Fed. Cir. 2006); *United Pac. Ins. Co. v. Roche*, 380 F.3d 1352, 1355 (Fed. Cir. 2004); *Admiralty Constr. Inc. v. Dalton*, 156 F.3d 1217, 1221 (Fed. Cir. 1998).

 The holdings of these cases all rest on the plain meaning of "contractor" contained in the CDA. *See* 41 U.S.C. § 7101(7). When interpreting a statute, a court must first divine the plain meaning of the applicable text. *See, e.g.*, *McNeill v. United States*, 131 S. Ct. 2218, 2221–22 (2011) ("As in all statutory construction cases, we begin with the language itself [and] the specific context in which that language is used." (alteration in original) (internal quotation marks omitted)). Here, it is a simple matter because the CDA itself provides the definition of a contractor as "a party to a Federal Government contract other than the Federal Government." 41 U.S.C. § 7101(7). As the plain meaning of the statute makes clear, because an equitable subrogee is not a party to a government contract, equitable subrogation does not allow a surety to bring claims pursuant to the CDA. *See Fireman's Fund*, 313 F.3d at 1351. Indeed, faced with the burden of having to breach this stone fortress, plaintiff's counsel at oral argument—understandably and to his credit—dropped the jurisdictional contention that plaintiff may proceed in this case as an equitable subrogee under the CDA. Tr. at 29:16–30:1.[5]

 This leaves as the sole remaining issue the question of whether plaintiff may proceed under the CDA as the assignee of Chavez. Defendant makes several arguments in support of its motion to dismiss. In denying that plaintiff's status as an assignee provides jurisdiction, and echoing the Federal Circuit's definitional argument in *Fireman's Fund*, defendant argues that an assignee may never bring an action under the CDA because an assignee, like an equitable subrogee, is not a contractor as defined by the CDA. *See* Def.'s Reply at 2–3 (citing *Fireman's Fund*, 313 F.3d at 1351); Tr. at 4:13–16. Defendant also contends that there was never a valid assignment from Chavez to plaintiff and there can be no waiver of the Anti-Assignment Acts for something that never existed in the first place. *See* Def.'s Reply at 11.

 But resolution of the pending motion does not require radical measures. *See Morse v. Frederick*, 551 U.S. 393, 431 (2007) (Breyer, J., concurring in the judgment in part and dissenting in part) ("[T]he 'cardinal principle of judicial restraint' is that 'if it is not necessary to decide more, it is necessary not to decide more.'" (quoting *PDK Labs., Inc. v. Drug Enforcement Admin.*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment))); *cf. Ashwander v. TVA*, 297 U.S. 288, 346–48 (1936) (Brandeis, J., concurring) (stating that the Court should refrain from deciding a constitutional issue when other grounds for deciding the case exist). Because there has been no conduct that can be construed as a waiver of the Anti-Assignment Acts, whether a valid assignment existed or not, the court lacks jurisdiction

---

[5] THE COURT: Let's turn to the *Firem[a]n's Fund* case for the statutory analysis, which seems to prohibit equitable subrogation cases under the CDA and may or may not allow it where there's a valid assignment because the [c]ourt didn't really get to that issue.
 [PLAINTIFF'S COUNSEL]: Right.
 THE COURT: Okay. Are you dropping the equitable subrogation claim under the CDA in light of that case?
 [PLAINTIFF'S COUNSEL]: In light of that case, yes, Your Honor.
Tr. at 29:16–30:1.

to hear these claims. *See Ins. Co. of the W.*, 243 F.3d at 1375 (holding that the Anti-Assignment Acts withdraw the Tucker Act's waiver of sovereign immunity for assignees).

Therefore, the court need not address the broader issue of whether the Court of Federal Claims can ever have jurisdiction over a case in which an assignee seeks to bring suit under the CDA. Instead, the court needs to address only the issue of whether the protections of the Anti-Assignment Acts here have been waived by defendant. This requires some explanation.

## B. The Anti-Assignment Acts

In general, the Anti-Assignment Acts together bar the assignment of: (1) a claim against the government, (2) a government contract, or (3) some lesser or future interest in a government contract. [6] *See Fireman's Fund*, 313 F.3d at 1349 ("These two provisions [the Anti-Assignment Acts] together broadly prohibit . . . transfers of contracts involving the United States or interest therein, and assignment of claims against the United States."); 31 U.S.C. § 3727 (pertaining to claims); 41 U.S.C. § 15 (pertaining to contracts). As the bifurcated nature of the Anti-Assignment Acts makes apparent, there are different types of assignment and which Act applies depends on what the assignee seeks to assert. *See Tuftco Corp. v. United States*, 614 F.2d 740, 744 n.4 (Ct. Cl. 1980). The Assignment of Claims Act "pertains to claims for work already done." *Id.* If not for the Assignment of Claims Act, an assignment of the right to assert claims would allow the assignee to bring any claim that the assignor might have against the government. *See Delmarva Power & Light Co. v. United States*, 542 F.3d 889, 893–94 (Fed. Cir. 2008) (recognizing that an assignment of claims, when not barred by the Assignment of Claims Act, validly assigns the assignor's claims to the assignee). In contrast to the Assignment of Claims Act's focus on completed work, the Assignment of Contracts Act "involv[es] executory contracts" and "is more concerned with continuing obligations." *Tuftco*, 614 F.2d at 744 n.4. An assignment of contracts could involve an assignment of contract performance, *see Tuftco*, 614 F.2d at 741–42, or of a lesser interest in a contract such as the right to receive payments from a contract, *see D & H Distrib. Co. v. United States*, 102 F.3d 542, 547–48 (Fed. Cir. 1996).

As the Anti-Assignment Acts make apparent, an assignment of the right to receive payments is different from an assignment of the right to assert claims. *See Fireman's Fund*, 313 F.3d at 1349 (noting the differences between the two provisions of the Anti-Assignment Acts). In addition, different rights need not be assigned together. *See Delmarva*, 542 F.3d at 892-93 (recognizing that the case before it concerned only an assignment of claims, not an assignment of contracts or an interest in a contract). Accordingly, an assignment of only the right to receive payments from a claim does not carry with it the right to assert the assignor's claims under the CDA. *Thomas Funding Corp. v. United States*, 15 Cl. Ct. 495, 501 (1988); *see also Produce Factors Corp. v. United States*, 467 F.2d 1343, 1347 (Ct. Cl. 1972) (not allowing the plaintiff to bring a breach of contract action because it was only assigned payments).

---

[6] Although the Anti-Assignment Acts bar the types of assignments referred to above, they do contain an exception not relevant here for assignments to "financing institutions," a classification that does not include plaintiff. *See Fireman's Fund*, 313 F.3d at 1350 (citing *Royal Indemnity Co. v. United States*, 117 Ct. Cl. 736, 746 (1950)) (noting that a surety is not a "bank, trust company, or other financing institution").

It is important to note that prohibiting an assignee of payments from asserting claims also furthers a purpose behind the Anti-Assignment Acts. The Anti-Assignment Acts were designed "to prevent possible multiple payment of claims, to make unnecessary the investigation of alleged assignments, and to enable the [g]overnment to deal only with the original claimant." *United States v. Shannon*, 342 U.S. 288, 291 (1952) (quoting *United States v. Aetna Sur. Co.*, 338 U.S. 366, 373 (1949)); *see also Dominion Resources, Inc. v. United States*, 641 F.3d 1359, 1367 (Fed. Cir. 2011) (Gajarasa, J., concurring-in-part and dissenting-in-part) (quoting *Shannon*, 342 U.S. at 291–92).[7]

Indeed, the prevention of the burden of facing multiple claims is a significant purpose behind the CDA as well. CDA was also intended to prevent the government from having to deal with multiple and duplicative claims by making the contractor the government's "single point of contact." *Admiralty Const., Inc. v. Dalton*, 156 F.3d 1217, 1220 (Fed. Cir. 1998). If assignees of payments were able to proceed under the CDA, the government would be at risk of having to litigate the same case multiple times—once with the contractor and again with any assignees of payments, an untenable situation in light of what Congress intended. *See Thomas Funding*, 15 Cl. Ct. at 501.

To be sure, in the context of this case, it would be strange for the court not to give some effect to the dual statutory purpose—that of proscribing multiple lawsuits—found in both sets of acts. And it would equally be remiss for the court not to require a clear showing of any governmental relinquishment of that enhanced dual protection, given the importance of those two statutes to this case. In fact, that is current law. Precedent binding on this court recognizes the prerogative of the government to waive its protection, to lift its immunity to suit. *See Delmarva*, 542 F.3d at 893; *D & H Distrib.*, 102 F.3d at 546. However, the law also requires that such a waiver be clearly made, for it is the sovereign that is being sued. *See Ins. Co. of the W.*, 243 F.3d at 1375; *D & H Distrib.*, 102 F.3d at 546.

Regardless of whether the Assignment of Claims Act or the Assignment of Contracts Act is implicated, the legal analysis for waiver is the same. *See Delmarva*, 542 F.3d at 893–94 (noting that "'the concerns of the two [Anti-Assignment Acts] and the legal concepts involved in their applicability are the same.'" (quoting *Tuftco*, 614 F.2d at 744 n.4)). The government can expressly waive the protections of either of the Anti-Assignment Acts by clearly stating its intention to do so. *See, e.g.*, *Delmarva*, 542 F.3d at 891 (accepting a waiver as valid based on the government counsel's express statement that the government was waiving the Anti-Assignment Acts). However, even if the government does not expressly waive the Anti-Assignment Acts, implied waiver can still be found based on the government's conduct. *See Tuftco*, 614 F.2d at 745 (finding that the government can, through its conduct, waive the Anti-Assignment Acts).

---

[7] The Supreme Court has recognized other purposes for the Anti-Assignment Acts. One is to prevent "persons of influence from buying up claims against the United States" and using their influence to exert political or other improper pressure in prosecuting those claims. *United States v. Shannon*, 342 U.S. 288, 291 (1952) (quoting *United States v. Aetna Sur. Co.*, 338 U.S. 366, 373 (1949)); *see also Patterson v. United States*, 354 F.2d 327, 329 (Ct. Cl. 1965).

To determine whether the government has implicitly waived the Anti-Assignment Acts, courts look at all conduct that can be construed as amounting to a waiver. The Supreme Court's opinion in *Johnson v. Zerbst*, 304 U.S. 458 (1938), has most often been cited as authority for this aptly named "totality of the circumstances" test. But because the equitable in nature totality of the circumstances test requires looking at any and all actions, the dangers of vagueness and contradiction often rear their ugly hydra-like heads in this approach. Thus, some defining parameters need to be drawn to supply context. *Zerbst* does this by requiring that conduct must demonstrate "an intentional relinquishment or abandonment of a known right or privilege" before waiver can be found. *Id.* at 464.[8] Indeed, common sense dictates that certain uniform characteristics be present before waiver can be found. These *sine qua non* "core components" must include some sort of relinquishment or renunciation, freely made, of something of value for a waiver to be found to exist.

To be sure, *Tuftco Corp. v. United States*, binding authority for this court, uses slightly different, but materially the same, core component language as *Zerbst* to find waiver. *Tuftco*, 614 F.2d at 746. It is doubly important to the case at bar because it too involves the issue of a waiver of the Anti-Assignment Acts. In *Tuftco*, the Department of Housing and Urban Development ("HUD") entered into a contract for the purchase of mobile homes. *Id.* at 741. The contractor then assigned performance under this contract to Tuftco. *Id.* Although Tuftco performed the contract and received some payments from HUD, other payments due under the contract were sent to the original contractor. *Id.* at 745–46. Tuftco then filed suit in the Court of Claims arguing that, as an assignee, it was entitled to the payments sent to the original contractor. *Id.* at 743. HUD argued that the contracting officer lacked the authority to assent to the assignments because the Assignment of Contracts Act, 41 U.S.C. § 15, prohibited this assignment of contract performance or payments. *Tuftco*, 614 F.2d at 743.

In holding that the assignment of the payments was valid (*ergo*, payments should have been made to the assignee Tuftco and not to the original contracting party), the court observed that the government may waive its rights under the Assignment of Contracts Act through conduct that shows ratification—or as the court termed it, "recognition"—of the assignment. *See id*. at 745 (citing *Maffia v. United States*, 163 F. Supp. 859, 862 (Ct. Cl. 1958); *G.L. Christian & Assocs. v. United States*, 312 F.2d 418, 423 (Ct. Cl. 1963), *cert. denied*, 375 U.S. 954 (1963)). Thus, to the court "ratification" demonstrated waiver. *See id.* The court concluded that the

---

[8] The definition of waiver as an intentional relinquishment or abandonment of a known right or privilege predates *Zerbst*, which is a Sixth Amendment right to counsel case. *See, e.g.*, *Hoxie v. Home Ins. Co.*, 32 Conn. 21, 40 (1864) (defining waiver as "the intentional relinquishment of a known right"). Following *Zerbst*, this test has become the standard employed in a variety of situations. *See, e.g.*, *Standard Indus., Inc. v. Tigrett Indus., Inc.*, 397 U.S. 586, 587 (1970) (quoting *Zerbst* in the context of a waiver of a patent invalidity claim); *Massie v. United States*, 166 F.3d 1184, 1190 (Fed. Cir. 1999) (quoting *Zerbst* in the context of a waiver of a breach of contract claim involving undelivered annuity payments); *Emps. of Dep't of Pub. Health & Welfare, Mo. v. Dep't of Pub. Health & Welfare, Mo.* 452 F.2d 820, 825 (8th Cir. 1971) (quoting *Zerbst* in the context of a waiver of state sovereign immunity); *Hermes Consol., Inc. v. United States*, 58 Fed. Cl. 409, 415–16 (2003) (quoting *Zerbst* in the context of a waiver of a breach of a jet fuel contract claim).

contracting officer in the case was "fully aware" of the assignments, ratified them, and communicated his ratification and assent to plaintiff.  *Id.* at 743.

The court in *Tuftco* noted that the soundest method for the government to manifest assent to an assignment would have been to enter into a novation agreement.[9]  *Id.* at 745.  Because there was no novation agreement in the case, the court looked at "the totality of the circumstances" surrounding the government's conduct—such as the receipt of a written notice of assignment, letters that detailed the assignment, and other actions—to reach the conclusion that the assignment was valid and waiver clearly occurred.  *Id.* at 745–46.  The court used somewhat different terminology than the Supreme Court did in *Zerbst.*  The *Tuftco* court used the phrase "knowledge, assent, and action,"[10] the fulfillment of which in an assignment setting would establish a ratification amounting to a waiver.  *Id.* at 746.  On the other hand, the Supreme Court in *Zerbst* used the phrase "intentional relinquishment or abandonment of a known right or privilege" to determine the existence of waiver.  *Zerbst*, 304 U.S. at 458.  But what is significant is that regardless of which set of words are used, *i.e.*, which terminology of "core components" is applied, in practice the results as to finding waiver would almost certainly be the same.

Nevertheless, the above summary comparison reveals a tension in the law.  On the one hand, a reasonable inference in *Tuftco* was sufficient to satisfy a totality of the circumstances test.  *See Tuftco*, 614 F.2d at 746; *see also United States v. Kelley*, 482 F.3d 1047, 1050 (9th Cir. 2007) (stating that a determination based on the "totality of the circumstances" includes "reasonable inferences"); *Blanchard v. Peerless Ins. Co.*, 958 F.2d 483, 488 (1st Cir. 1992) (holding that summary judgment was precluded unless no reasonable trier of fact could draw "any other inference from the totality of the circumstances"); *Eltech Sys. Corp. v. PPG Indus., Inc.*, 903 F.2d 805, 810 (Fed. Cir. 1990) (allowing the use of inference when considering all the circumstances).

On the other hand, the general rule in law is that when something must be clearly shown then mere inference will not suffice.  *See, e.g., White Mountain Apache Tribe*, 537 U.S. at 472 (holding that jurisdiction over any suit against the government requires a clear and unambiguous statement from the United States waiving sovereign immunity) (citations omitted); *Helvering v. Fitch*, 309 U.S. 149, 156 (1940) (stating that the grounds for relief "must be bottomed on clear and convincing proof, and not on mere inferences and vague conjectures"); *Aspex Eyewear, Inc. v. Clariti Eyewear, Inc.*, 605 F.3d 1305, 1316 (Fed. Cir. 2010) (stating that "[i]ntent to deceive

---

[9] A novation agreement substitutes an original party to a contract with a new party.  *See Ginsberg v. Austin*, 968 F.2d 1198, 1200 (Fed. Cir. 1992); *Hicks v. United States*, 89 Fed. Cl. 243, 257 (2009) (quoting Restatement (Second) of Contracts § 280 (1981) (defining novation as "a substituted contract that includes as a party one who was neither the obligor nor the obligee of the original duty")); *see generally* Black's Law Dictionary 1168 (9th ed. 2009) (defining novation).

[10] The full quote of the language used by the *Tuftco* court is as follows: "It is enough to say that the totality of the circumstances presented to the court establishes the [g]overnment's recognition of the assignments by its knowledge, assent, and action consistent with the terms of the assignment."  *Tuftco*, 614 F.2d at 746.

- 11 -

cannot be inferred . . . but must be separately proved by clear and convincing evidence"); *Waskow v. Associated Press*, 462 F.2d 1173, 1176 (D.C. Cir. 1972) (doubting that piling "an inference upon an inference" could ever provide "convincing clarity"). Thus, tension exists between the requirement that the Anti-Assignment Acts be clearly waived, *see D & H Distrib.*, 102 F.3d at 546, and the use of a totality of the circumstances test relying on inference to show that waiver, *see Zerbst*, 304 U.S. at 464; *Tuftco*, 614 F.2d at 746.  That being said the relevant precedent is not irreconcilable. Although such an occurrence is likely to be rare, it is possible that in some cases the totality of the circumstances may be enough to clearly demonstrate waiver, as the Court of Claims, the predecessor to the Federal Circuit, held in *Tuftco*. *See* 614 F.2d at 746.

Finally, in addition to the "core components" of *Zerbst* and *Tuftco*, which give form to the gelatinous "all the circumstances" waiver test, other formulations have been derived to ascertain when waiver occurs in the context of the Anti-Assignment Acts.  While not as fundamental as core components, the fulfillment of which is conceptually mandatory for any waiver, certain "guideposts" have been established that are helpful in ascertaining waiver.  These guideposts establish factors that may help define assignments and waivers of the Anti-Assignment Acts in a government contract setting.

For instance, in *Riviera Finance*, this court developed four guideposts to aid its analysis: (1) Did "the assignor and/or the assignee sen[d] notice of the assignment"; (2) Did the contracting officer "sign[] the notice of assignment"; (3) Did the contracting officer "modif[y] the contract according to the assignment"; and (4) Did the contracting officer "sen[d] payments to the assignee." *Riviera Fin. of Tex., Inc. v. United States*, 58 Fed. Cl. 528, 530 (2003). Guideposts such as these can serve as a starting point for analysis. *See Van Orden v. Perry*, 545 U.S. 677, 700 (2005) (Breyer, J., concurring) (noting that while "prior tests provide useful guideposts . . . no exact formula can dictate a resolution to such fact-intensive cases"); *Smith v. Doe*, 538 U.S. 84, 97 (2003) (noting that the relevant factors "are neither exhaustive nor dispositive, but are useful guideposts" (citations and internal quotations marks omitted)).

Nevertheless, these guideposts are not talismanic tests that substitute for the process of applying the law. *See Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 465 (1996) (Scalia, J., dissenting) (quoting *Hanna v. Plumer*, 380 U.S. 460, 466–67 (1965)) (noting that the relevant test "'was never intended to serve as a talisman'"); *NLRB v. Int'l Longshoremen's Ass'n*, 473 U.S. 61, 81 (1985) (stating that the "various linguistic formulae and evidentiary mechanisms" employed by the Court "are not talismanic nor can they substitute for analysis."); *see also Riviera*, 58 Fed. Cl. at 530 (noting that the four factors it mentions are not exhaustive).  With this warning in mind, the court turns toward the primary conflict in this case, the application of the Anti-Assignment Acts.

## C. Application of Anti-Assignment Acts to This Case

It is initially helpful to explain exactly what plaintiff believes the source of the relevant assignment is and what law applies to both the assignment and the waiver of that assignment. Plaintiff relies on the so-called "assignment" mentioned in the General Indemnity Agreement

("GIA") to support its assignment claim.[11]  Pl.'s Sur-Reply at 5.  Specifically, plaintiff relies on Chavez's purported assignment to plaintiff of "all monies due or to become due to [Chavez] as a result of the contract covered by [the] Bonds . . . and proceeds of any delay or other damage claims."  *Id.* (quoting GIA ¶ 5).

But, it is uncertain exactly which Anti-Assignment Act statute plaintiff contends was waived.  In its opposition to defendant's motion to dismiss, plaintiff refers to "the Assignment of Claims Act" but then cites both 31 U.S.C. § 3727 (the Assignment of Claims Act) and 41 U.S.C. § 15 (the Assignment of Contracts Act).  *See* Pl.'s Opp'n at 5.  And Chavez, in its claim, stated that it "assigned to ICW all rights to any claims."  Def.'s Reply App. at 5.  But at the hearing, plaintiff's counsel stated that "what's being asserted here is that it was a waiver of the Anti-Assignment Act as to contract rights."  Tr. at 38:5–7.  That being said, it is clear that the Assignment of Claims Act is the relevant act in this case because plaintiff seeks to assert claims for work that it alleges to have already been performed.  *See Tuftco*, 614 F.2d at 744 n.4.

It is also clear that plaintiff's argument that the Navy waived the Assignment of Claims Act's protection against lawsuit, *see* Pl.'s Sur-Reply at 5, is based on a proffered set of facts that, when taken together, allegedly demonstrate waiver, *see* Pl.'s Opp'n at 6.  Therefore, according to plaintiff, the "totality of the circumstances" test has been met.  *Id.* (quoting *Tuftco*, 914 F.2d at 746).  Yet, as we shall see, plaintiff does not adequately explain precisely how its alleged facts bundled together show waiver.  While facts to John Adams may indeed be "stubborn things,"[12] a mere proffering of disparate facts, as plaintiff has done, is a weak reed indeed.

To be sure, plaintiff does concede that the *Riviera Finance* guideposts are inapplicable here.  According to plaintiff this is so because, applying the guideposts, it did not send written notice of the assignment to the Navy, the Navy's CO neither signed any notice of assignment nor modified the contract to reflect an assignment, and the Navy never paid plaintiff pursuant to any assignment.  *See* Tr. at 36:2–19 (plaintiff's counsel stating that the "four factors [from *Riviera Finance*] are not applicable to this case today"); *Riviera*, 58 Fed. Cl. at 530 (listing four factors the court considered relevant to determine waiver of the Anti-Assignment Acts).  On the other hand, plaintiff contends that the following alleged facts, taken together, demonstrate a waiver of the Assignment of Claims Act by the Navy.  *See* Am. Compl. ¶ 6; Pl.'s Opp'n at 5–6; Pl.'s Sur-Reply at 6–7. These are reduced to bullet points by the court for clarity.  The court notes that plaintiff does not in any pleading discuss the relevance of its proffered alleged facts to the waiver issue, except for the last bullet point:

---

[11] Originally, plaintiff argued that the Settlement Agreements signed by Chavez's principals contained the relevant assignment. Pl.'s Opp'n at 5.  However, plaintiff now relies solely on the GIA.  Tr. at 54:7–12 (plaintiff's counsel stating that "the only effective assignment as to [Chavez] was through the indemnity agreement" and therefore the indemnity agreement is "what we need to focus on").

[12] John Adams, Argument in Defense of the Soldiers in the Boston Massacre Trials (December 1770), *quoted in* John Bartlett, Bartlett's Familiar Quotations 351 (Justin Kaplan ed., 17th ed. 2002).

- According to plaintiff, after Chavez defaulted on its obligations to plaintiff, both Chavez and plaintiff in August 2002 notified the Navy of the default and requested that the Navy make any future payments to plaintiff, rather than to Chavez. Am. Compl. ¶ 6; Pl.'s Opp'n at 6; Pl.'s Sur-Reply at 7;

- The Navy was aware that plaintiff provided assistance to Chavez, including the hiring of Roel to assist and consult with Chavez on the project. Pl.'s Opp'n at 6; Pl.'s Sur-Reply at 6;

- The Navy included plaintiff and Roel in settlement discussions regarding Chavez's claims, with the Navy instructing plaintiff and Roel to submit a request for equitable adjustment for Chavez's claims. Pl.'s Sur-Reply at 6;

- To show the Navy's notice and recognition of an assignment, plaintiff relies upon language in a March 8, 2007, claim that Chavez submitted to the Navy that allegedly stated that the claim was made "on behalf of ICW." *See* Pl.'s Opp'n at 6; Am. Compl. ¶ 17. In its only explanation made to justify its facts, plaintiff contends that the Navy's failure to object to this language in the claim demonstrates waiver by the government because the government "did not reserve its right to claim the protections" of the Anti-Assignment Acts. Pl.'s Opp'n at 6.

Taken together these alleged facts could conceivably raise an inference that the Navy may have known of an assignment of claims and assented to it. After all, the Navy was aware that Chavez was receiving assistance from plaintiff and had agreed to have any future payments on the project sent to plaintiff. *See* Pl.'s Opp'n at 6. Employees from the Navy also held discussions with plaintiff about the settlement of Chavez's claims and told plaintiff to submit a request for equitable adjustment to pursue Chavez's claims. *See* Pl.'s Sur-Reply at 6. And when Chavez ultimately did assert its claims, it specifically declared that it had assigned all the rights to those claims to plaintiff. *See* Pl.'s Opp'n at 6. Thus, taking all these circumstances into account, it was not wholly unreasonable for plaintiff to believe that the Navy considered plaintiff to be entitled to Chavez's claims. This belief could have been reinforced by the Navy's silence.

Ultimately, however, the inference is judged not by plaintiff's subjective view, but rather by an objective look at the totality of the circumstances. *See Zerbst*, 304 U.S. at 464; *Tuftco*, 614 F.2d at 746. Here, this inference is not strong enough to show the requisite clear assent to the assignment. *See D & H Distrib.*, 102 F.3d at 546. This is because, rather than being a model of clarity, the circumstances here are fraught with ambiguity. This ambiguity is poison to the sort of clarity required for a waiver of the Anti-Assignment Acts and the withdrawal of the sovereign's consent to suit. *See, e.g., Orff*, 545 U.S. at 601–02 (waivers of sovereign immunity must be strictly construed); *Ins. Co. of the W.*, 243 F.3d at 1375.

Take plaintiff's first bullet point allegation—that waiver of the statutory prohibition against assignment was shown by the August 2002 notice to the Navy both of Chavez's default on plaintiff's bonds and the request to the Navy to forward all future payments to plaintiff. It is ambiguous because there is a reasonable explanation other than the one plaintiff proffers. For instance, the notice requested payments from the Navy, but did not make mention of any

- 14 -

assignment. The import of this is that the August 2002 notice at most informed the Navy that plaintiff had been assigned the right to any payments by Chavez. It says nothing about plaintiff's vicarious right to assert claims that Chavez might have against the Navy. *See id.* Furthermore, an assignment of payments does not by itself allow the assignee to bring claims under the CDA. *See Thomas Funding*, 15 Cl. Ct. at 501. And critically here, the complaint avers only CDA claims, not a claim for payments that might be owed to Chavez. *See supra* note 4 (plaintiff's counsel acknowledging that the complaint asserts only CDA claims); Am. Compl. ¶¶ 10–17. In short, the default notification did not provide the Navy with the clear, unambiguous knowledge required for a waiver that would allow plaintiff to assert the type of claims it asserts in its complaint.

The facts alleged in the second bullet point suffer from the same malady. The Navy's knowledge that plaintiff and Roel were assisting Chavez to complete the project does not by itself equate to knowledge or recognition of an assignment. Clearly put, it was in plaintiff's interest to assist Chavez even without any assignment because plaintiff, as the performance bond surety, would ultimately be responsible for performing any work left uncompleted by Chavez. *See United Pacific Ins. Co.*, 464 F.3d at 1326 n.2 (explaining that a performance bond surety guarantees project completion if the contractor defaults). Thus, plaintiff's behavior could rationally reflect the actions of a prudent surety. *See Ins. Co. of the W.*, 243 F.3d at 1370–71 (noting that a surety must fulfill its obligations under the bonds it issued to be equitably subrogated to the contractor's rights). Here again, the ambiguity of the meaning of the assistance undermines plaintiff.

The third bullet point suffers from a failure of proof. Here, plaintiff argues that the Navy recognized its right to assert Chavez's claims when, following Chavez's default, plaintiff and Roel participated in settlement discussions with the Navy during which time they were told to submit a formal request for equitable adjustment to pursue Chavez's claims. Significantly, plaintiff does not indicate who specifically from the Navy relayed this offer or whether the alleged person had authority to act for the government. *See id.* It is well-established that only certain government employees can bind the government. *See, e.g., Flexfab, L.L.C. v. United States*, 424 F.3d 1254, 1260 (Fed. Cir. 2005) (quoting *City of El Centro v. United States*, 922 F.2d 816, 820 (Fed. Cir. 1990) (noting that in the context of government contracts "the [g]overnment representative whose conduct is relied upon must have actual authority to bind the government.")). Indeed, it is an authorized official, such as the contracting officer, who must have knowledge of the assignment and assent to it, rather than some unknown employee. *United Cal. Disc. Corp. v. United States*, 19 Cl. Ct. 504, 510 (1990); *see D & H Distrib.*, 102 F.3d at 546 (finding waiver where the contracting officer's conduct showed assent to the assignment); *Tuftco*, 614 F.2d at 747 (same). It is the plaintiff who bears the burden of establishing the official's "actual" authority; not even apparent authority will suffice. *See Winter v. Cath-dr/Balti Joint Venture*, 497 F.3d 1339, 1344 (Fed. Cir. 2007) (requiring the plaintiff to show that the "contract was modified by someone with actual authority"); *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384 (1947) ("anyone entering into an arrangement with the [g]overnment takes the risk of having accurately ascertained that he who purports to act for the [g]overnment stays within the bounds of his authority").

Regardless of the authority issue, plaintiff's reliance on one unattributed statement instructing it to submit Chavez's equitable adjustment claim ignores the surrounding circumstances that demonstrate patent ambiguity. It certainly raises questions. Why were both plaintiff and Roel told by this unnamed official to bring the alleged equitable adjustment claim if what plaintiff seeks to prove is that it was the sole assignee of Chavez's claim? *See* Ulibarri Decl. ¶ 8. In any event, a vague statement made under ambiguous circumstances by some unnamed, unidentified government official is not sufficient to show the intentional relinquishment and clear assent or recognition required for waiver of the Assignment of Claims Act. *See Zerbst*, 304 U.S. at 464; *Tuftco*, 614 F.2d at 746; *D & H Distrib.*, 102 F.3d at 546.

Plaintiff's final waiver argument, found in the fourth bullet point, is based on the claim Chavez filed with the Navy that purportedly notified the Navy that plaintiff had been assigned Chavez's rights. *See* Pl.'s Opp'n at 3. On March 8, 2007, Chavez filed a claim with the Navy seeking additional compensation for project delays and additional work. *See id.* In the claim language was included that declared that Chavez "assigned to ICW all rights to any claims against the [g]overnment."[13] Def.'s Reply App. at 5. Plaintiff relies on this language to argue that since the Navy was "notified" of the assignment, the Navy's failure to object was somehow tantamount to recognition of the assignment. *See* Pl.'s Opp'n at 3, 6.

It is dubious whether the language in the claim by itself is enough to clearly show that the Navy recognized the ostensible assignment—especially since it was Chavez, and not plaintiff, who brought the claim. Simply put, this (and other factors surrounding the purported assignment) indicates that it is highly unlikely that the Navy gave its clear assent to the assignment. *See D & H Distrib.*, 102 F.3d at 546.

Plaintiff's argument that silence is golden, *see* Pl.'s Opp'n at 6, is based on a doctrine at least as old as Roman law: *qui tacet consentire videtur* (one who is silent may be seen to have given consent).[14] What will determine the legitimacy of tacit consent are the circumstances surrounding the silence, particularly if rights and privileges are implicated. It is presumed that the innocent party will speak out or otherwise respond to a possible infringement of a right or privilege. *See Georgia v. South Carolina*, 497 U.S. 376, 389 (1990) (holding that in a jurisdictional dispute over the Barnwell Islands, South Carolina established sovereignty over the islands by prescription and acquiescence due to inaction of Georgia in objecting to South Carolina's exercise of taxation and other incidents of sovereignty); *United States v. Midwest Oil Co.*, 236 U.S. 459, 472–73 (1915) (noting that "[g]overnment is a practical affair intended for practical men," and the rule, that long acquiescence in a governmental practice raises a presumption of authority, applies to the practice of withdrawals by the executive of lands opened by Congress for occupation); *see also Harbert/Lummus Agrifuels Projects v. United States*, 142

---

[13] Plaintiff asserts that Chavez filed this claim "on behalf of ICW." Am. Compl. ¶ 17. However, the words "on behalf of ICW" do not appear in the claim. *See* Def.'s Reply App. at 1–11.

[14] *See United States v. Irvine*, 511 U.S. 224, 242 (1994) (Scalia, J., concurring) (applying the principle of *qui tacet consentire videtur* to the disclaimer of a bequest); *Thompson v. United States*, 227 F.2d 671, 674 (5th Cir. 1955) (citing the principle of *qui tacet consentire videtur* in the context of a criminal case); *see generally* Black's Law Dictionary 1866 (9th ed. 2009) (defining *qui tacet consentire videtur* as "A party who is silent appears to consent").

F.3d 1429, 1433–34 (Fed. Cir. 1998) (holding that the surrounding facts did not indicate that the contracting officer's silence amounted to assent).

Accordingly, the resolution of plaintiff's tacit consent argument requires the court to apply the ancient "all the circumstances" standard by reviewing the circumstances surrounding a possible waiver of the statutory right or privilege created by Congress in the Assignment of Claims Act. *See Zerbst*, 304 U.S. at 464 (waiver is shown by looking at the totality of the circumstances); *Delmarva*, 542 F.3d at 891 (waiver of prohibition against assignment of claims); *Tuftco*, 614 F.2d at 746 (waiver of prohibition of assignment of contract payments). This standard is nothing more than the long-held legal rule that when interpreting words and phrases courts must look to context as the key to understanding. *See Jones v. United States*, 527 U.S. 373, 389 (1999) (stating that "[s]tatutory language must be read in context and a phrase 'gathers meaning from the words around it'" (quoting *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961))); *Allied Tech. Grp., Inc. v. United States*, No. 2010-5131, 2011 WL 2275775, *7 (Fed. Cir. June 9, 2011) (stating that a "contract must be interpreted as a whole in a manner that gives reasonable meaning to all its part and avoids conflicts in, or surplusage of, its provisions" (quoting *Burnside-Ott Aviation Training Ctr. v. Dalton*, 107 F.3d 854, 860 (Fed. Cir. 1997))).

In support of its argument, plaintiff contends that the failure of the Navy to object to the assignment provision meant that it "did not reserve its right to claim the protections afforded under the Assignment of Claims Act." Pl.'s Opp'n at 6. As plaintiff tells it, this means that "[a]s with *Tuftco*, the [g]overnment's silence is an implicit recognition of Chavez's assignment of its rights under the contract to ICW." *Id.* Essentially, this is the extent of plaintiff's argument.

To be sure, plaintiff misunderstands the nature of both Anti-Assignment Acts and misconstrues *Tuftco*. It is not incumbent upon the government to reserve the protections of the Anti-Assignment Acts. Rather, the Anti-Assignment Acts protect the government unless they are clearly waived, s*ee Delmarva*, 542 F.3d at 893; *D & H Distrib.*, 102 F.3d at 546, and silence can amount to waiver only when an "all the circumstances" review indicates such a waiver. *See, e.g.*, *Georgia*, 497 U.S. at 389.

Furthermore, plaintiff misconstrues *Tuftco* because the waiver in *Tuftco* did not stem from the government's silence, as plaintiff asserts, but in reality from the words and conduct of the government's CO. *See Tuftco*, 614 F.2d at 745. In *Tuftco*, the assignee and assignor contacted the CO prior to making the assignments and were assured by the CO that the assignments would be proper and that the government would assent to them. *Id.* Following finalizing the terms of the assignments, the parties sent written notice of the assignments to the CO. *Id.* at 746. The CO thereafter wrote on the notice "assignment acknowledged," and also added his signature and the date he signed the document. *Id.* Significantly, the government acted in accordance with the assignments by making payments required by the assignments. *Id.* Such facts, taken together, demonstrate unambiguous conduct clearly amounting to a waiver. *See id.* No such circumstances are present in our case.

Indeed, looking at the Navy's silence in context, the court finds its significance vague at best. It was Chavez that made the claim against the Navy. The conflict to be resolved was between them. Any other declaration or writing in the claim relating to a third party, not

necessary to the underlying dispute, without more, can hardly be said to bind the Navy to a future commitment to that third party.

What happened after Chavez submitted its claim to the Navy was quite simple. The Navy's CO thereafter issued a decision to Chavez, the submitter of the claim. *See* Def.'s Mot. to Dismiss App. at 35–36. Unlike what happened in *Tuftco*, the Navy did not address or respond to the ostensible assignee, our plaintiff, *see id.* at 1, nor did it make any payments to plaintiff, *see* Tr. at 36:2–19. The court finds that the circumstances surrounding this case do not demonstrate that the Navy's silence clearly amounted to a tacit acceptance, or, as the *Tuftco* court would put it, a "recognition" of an assignment from Chavez to plaintiff.

In sum, without both knowledge and assent the Navy cannot be found to have intentionally relinquished the protections of the Anti-Assignment Acts. *See Zerbst*, 304 U.S. at 464; *Tuftco*, 614 F.2d at 745. The circumstances relayed by plaintiff do not singularly or collectively clearly show waiver of the Assignment of Claims Act by the Navy. Because plaintiff, who asserts jurisdiction as an assignee, cannot bring Chavez's claims without such a waiver, defendant's motion to dismiss must be granted. *See Ins. Co. of the W.*, 243 F.3d at 1375.

## IV. CONCLUSION

For the reasons stated above, defendant's MOTION to dismiss this action for lack of jurisdiction is GRANTED. The Clerk is directed to take the necessary actions to dismiss this matter.

**IT IS SO ORDERED.**

*s/ Lawrence J. Block*

**Lawrence J. Block**
**Judge**